## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 01 2018, 8:07 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Carlos I. Carrillo
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: L.G., a Child, and

M.S. (Mother),

*Appellant-Respondent,*

v.

Department of Child Services,

*Appellee-Petitioner.*

February 1, 2018

Court of Appeals Case No.
79A02-1709-JT-2152

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause No.
79D03-1703-JT-23

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, M.S. (Mother), appeals the trial court's Order for Involuntary Termination of Parental Rights to her minor child, L.G. (Child).

We affirm.

# ISSUE

Mother raises one issue on appeal, which we restate as: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of Mother's parental rights.

# FACTS AND PROCEDURAL HISTORY

Mother and C.G. (Father)[1] are the biological parents of the Child, born on March 7, 2014; and B.G., born on March 17, 2015. Both children were born premature, and both children had positive meconium screens for marijuana. The children's positive drug screens were reported to DCS, and DCS investigated but found no basis to intervene at those times.

On Monday, November 16, 2015, the Tippecanoe County office of DCS received a report alleging that the Child and B.G. were victims of neglect. Earlier that day, Father and his sister, L.G., had taken eight-month-old B.G. to the emergency room at St. Elizabeth East Hospital in Lafayette, Tippecanoe

---

[1] Father's parental rights to the Child were terminated on August 24, 2017. Father does not participate in this appeal.

County, Indiana. Father reported that he had discovered B.G. not breathing when he checked on her that morning. Neither Father nor Mother called 9-1-1. B.G. was pronounced dead upon arrival, and the hospital contacted DCS. The emergency room physician observed that B.G. had already begun to decompose and undergo the rigor mortis process, estimating that she had been deceased for at least twenty-four hours prior to being presented in the emergency room. The coroner estimated B.G. had been deceased between twenty-four and thirty-six hours. The physician also observed that B.G. was noticeably malnourished and that she had bruising near her anus and vagina, which resulted in the completion of a rape kit. The DCS assessor described B.G.'s body as

> (1) very small for her age, (2) underweight, (3) her head disproportionately larger than her body, (4) sunken eyes, (5) her skin already becoming a different color, (6) her body starting to lose rigor, (7) a flat spot on the back of her head with hair falling out, (8) her stomach bloated, (9) her skin appeared loose, and (10) there appeared to be no body fat.

(DCS Exh. 3, p. 35). At this time, Mother's whereabouts were unknown, although it was later discovered that she had taken the Child to the home of a maternal uncle.

[6] The Lafayette Police Department interviewed Father and Mother regarding B.G.'s death. Initially, both parents reported that B.G. had been fed at 8:00 p.m. on Sunday night and was found not breathing on Monday morning. Mother later altered her version of events to indicate that she knew B.G. was not breathing at 12:30 a.m. on Sunday but was not ready to "let her go just

yet." (DCS Exh. 2, p. 8). Mother indicated that she and Father intended to deliver B.G. to the hospital on Sunday evening, so they drove to L.G.'s home in order for L.G. to babysit the Child while they took B.G. to the hospital. Instead, they visited with L.G. for an hour, leaving B.G.'s body in the car, and ultimately decided not to go to the hospital until the next day. The Lafayette Police Department searched the family's home and observed that it was clean but had minimal food for the children and smelled of marijuana. The police officers specifically noted their suspicion that "the home is [not] typically as clean and well kept as it was found." (DCS Exh. 2, p. 9). Following the parents' interviews, DCS removed the Child from their custody and placed her in foster care. At the time, the Child appeared to be underweight but was otherwise generally healthy and did not exhibit any injuries.

[7] On November 18, 2015, the trial court conducted an initial hearing and a detention hearing. The same day, DCS filed a petition alleging the Child to be a Child in Need of Services (CHINS). DCS argued that the Child's physical or mental condition was seriously impaired or endangered as a result of the inability, refusal, or neglect of Father and Mother to provide for the Child's necessary care and safety. DCS primarily relied on B.G.'s death and the surrounding circumstances, specifically the fact that Father and Mother waited so long to take B.G. to the hospital after discovering that she had died. DCS discussed that B.G.'s cause of death was pending but that she was nevertheless "visibly underweight" and "also had visible injuries" at the time of death. (DCS Exh. 2, p. 4). Furthermore, DCS noted that both Father and Mother

"presented oddly" during interviews surrounding B.G.'s death. (DCS Exh. 2, p. 5). "Father was unemotional and never acknowledged [that B.G.] died before arriving at the hospital. Mother showed an appropriate emotional response to her child's death but could not explain how [B.G.] died and offered odd explanations for how [B.G.] was treated and fed, including giving [eight-month-old B.G.] pizza rolls." (DCS Exh. 2, p. 5). DCS argued that the Child "is too young to express to others if she is in danger or has been harmed." (DCS Exh. 2, p. 5).

[8] DCS also filed a petition for parental participation in order for Father and Mother to initiate services designed to assist "in fulfilling their [parental] obligations." (DCS Exh. 2, p. 6). Father and Mother immediately began having supervised visits with the Child, and parents reportedly had consistent attendance and interacted well with the Child and provided for all of her needs during the visits. In addition, DCS made referrals for substance abuse assessments, therapy, and home-based case management. The parents, who had lived together for a number of years, actively worked with their home-based case manager to establish and maintain a budget. At the time, Father was employed full-time at McDonald's, and Mother, who had never worked more than a week or two in her life, indicated that she previously stayed home to care for the Child and B.G. and had no intention of obtaining employment in the future. Mother received government-funded housing, utility assistance, and food stamps. With Father's income and Mother's benefits, they demonstrated to the home-based case manager that they were able to live within their means.

Both Father and Mother completed a substance abuse assessment; however, there were concerns that Father and Mother were not forthright about their substance abuse to ensure that proper recommendations could be made, and DCS noted that they did not submit to every requested drug screen. While Mother never submitted any positive drug screens for non-prescribed substances, Father tested positive for alcohol on one occasion. Both Father and Mother also attended parenting classes at the YWCA but did not submit documentation indicating that they successfully completed the program. As to therapy, both parents delayed completing intake appointments for six months after the referral and exhibited reluctance to participate. According to Mother, they had been advised by attorneys in their respective criminal cases not to discuss the circumstances of B.G.'s death with anyone. DCS advised Mother to nevertheless attend therapy appointments to address grief and other issues without discussing matters of an incriminatory nature, but Mother did not do so. Eventually, in May or June of 2016, Mother attended one therapy session but missed the next three scheduled sessions. Father began consistently attending therapy in August of 2016, but the therapist indicated that Father's therapy had "reached a plateau" by December of 2016. (DCS Exh. 4, p. 25).

[9] On January 7 and February 15, 2016, the trial court held a fact-finding hearing. On May 17, 2016, the trial court adjudicated the Child to be a CHINS.[2]

---

[2] Father and Mother subsequently appealed the trial court's CHINS adjudication, and on February 17, 2017, this court affirmed the trial court in a memorandum decision. *Matter of L.G. v. Ind. Dep't of Child Servs.*, No. 79A05-1607-JC-1558, 2017 WL 655870 (Ind. Ct. App. Feb. 17, 2017).

Relying on B.G.'s undetermined cause of death, malnourished state at the time of death, the ongoing criminal investigation related to B.G.'s death, and the parents' delay in seeking medical treatment, the trial court noted that it was "not required to wait until [the Child] suffers a similar harm [as B.G.] before intervening." (DCS Exh. 3, p. 37).

[10] At some point, the pathologist, who conducted B.G.'s autopsy on November 17, 2015, provided a final autopsy report. At the time of autopsy, eight-month-old B.G. weighed eleven pounds. The cause of death was determined to be "positional asphyxia/suffocation" with no evidence of strangulation. (DCS Exh. 3, p. 36). The pathologist noted that B.G. "was underdeveloped, poorly nourished, and dehydrated with wasting muscle and a fatty, widened facial appearance." (DCS Exh. 3, p. 35). The dehydration and condition of B.G.'s lower intestine indicated that B.G. "had been fed within two (2) to three (3) days prior to death." (DCS Exh. 3, p. 35). The pathologist "opined that [B.G.'s] condition could be the result of growth retardation due to poor feeding or due to poor care suggesting that a review of medical records would provide necessary insight." (DCS Exh. 3, p. 35). Medical records indicated that while pregnant with B.G., Mother received inadequate prenatal care. B.G. was born five weeks early and weighed slightly over three pounds; she was released from the NICU when she reached six pounds, several weeks after birth. B.G. missed her six-month well-check appointment and had not seen a physician since May of 2015—*i.e.*, six months prior to death. The pathologist "stated that being underweight, malnourished, and/or dehydrated is not necessarily indicative of

abuse but may increase the risk of secondary medical problems." (DCS Exh. 3, p. 36). Furthermore, B.G.'s "condition at the time of death should have alerted a reasonably prudent caregiver that something was wrong." (DCS Exh. 3, p. 36). As to the bruising near her vagina and anus, the pathologist saw no evidence of semen and noted that the bruising "did not necessarily indicate abusive trauma." (DCS Exh. 3, p. 35). The pathologist concluded that B.G. had died "up to [two and one-half] days" before the autopsy. (DCS Exh. 3, p. 36).

[11] On June 16, 2016, Mother and Father were arrested in connection with B.G.'s death. Mother was charged with neglect of a dependent resulting in death, a Level 1 felony; neglect of a dependent resulting in serious bodily injury, a Level 3 felony; neglect of a dependent resulting in bodily injury, a Level 5 felony; neglect of a dependent, a Level 6 felony; false informing, a Class A misdemeanor; failure to report a dead body, a Class A misdemeanor; two Counts of perjury, Level 6 felonies; and obstruction of justice, a Level 6 felony. Father was similarly charged—but with only one Count of perjury instead of two.

[12] On June 21, 2016, the trial court issued a Disposition Order, finding that the Child should remain in foster care and granting wardship of the Child to DCS. That day, the trial court also entered a Parental Participation Decree, essentially memorializing the participation plan that had been implemented shortly after the Child's removal. Specifically, the trial court ordered both Father and Mother to, in part: remain in contact with DCS; obtain and maintain safe

housing suitable for children; refrain from consuming or possessing alcohol or non-prescribed controlled substances; submit to random drug screens; obtain and maintain a legal and stable source of income adequate to support the household; enroll in any services referred by DCS within ten days of referral; "[b]e honest with DCS, [service providers], [and] the [c]ourt"; and obey the law. (DCS Exh. 3, p. 41). Father and Mother were further ordered to participate in supervised visits with the Child; participate in home-based case management and follow all recommendations; participate in individual therapy and follow recommendations; and participate in a parent education class at the YWCA or other community program.

[13] A few days after the Disposition Order was issued, Father posted bond and was released from jail. He resumed regular parenting time with the Child. Mother, on the other hand, was unable to post the $50,000 surety/$5,000 cash bond and remained incarcerated in the Tippecanoe County Jail. On August 10, 2016, DCS moved to modify the Disposition Order, requesting that Mother's visitation be suspended during her incarceration and that Father's visitation be reduced due to his lack of engagement in services. On August 15, 2016, the trial court held a hearing and granted DCS's request for modification. Specifically, the trial court suspended parenting time during Mother's incarceration and ordered no telephone contact between the parents and Child due to the Child's age. The trial court stated that the parents could exchange letters, drawings, or photos with the Child through DCS. The trial court ordered that Father could have parenting time with the Child at least two times

per week, fully supervised and contingent upon Father's compliance with the terms of his pre-trial release and Father's consistent participation in therapy.

[14] In August of 2016, the Child began individual therapy to address anxiety and certain behaviors that she had exhibited in her foster home—specifically, nightmares, angry tantrums, smearing fecal matter, and seemingly sexual displays in her play and behavior. The Child's therapist diagnosed her with post-traumatic stress disorder and opined that the root of the Child's trauma was the removal from her home and the loss of her sibling. In her foster home, the Child had displayed caretaking behaviors toward her young foster brother, "indicative of that she was aware of [w]hat was happening and what was going on [with B.G.], but not sure what to do about it." (Tr. Vol. II, p. 14). The therapist further noted that the Child would be at risk for reactive attachment disorder—where "relationship boundaries . . . get a little skewed when we don't have a normal pattern of relationships"—if she were removed from her foster parents, with whom she had established a bond. (Tr. Vol. II, p. 17). Although Mother had written letters to the Child and provided them to DCS, the therapist determined that it would be "counter-productive" and "confusing" for the Child to receive the letters until she is older. (Tr. Vol. II, pp. 22-23).

[15] On January 6, 2017, Father entered into a plea agreement, pleading guilty to neglect of a dependent resulting in death, a Level 1 felony; failure to report a dead body, a Class A misdemeanor; perjury, a Level 6 felony; and obstruction of justice, a Level 6 felony. The remaining charges were dismissed. On March 9, 2017, Father was sentenced to an aggregate term of thirty-five years, with

thirty-four years executed in the Indiana Department of Correction and one year suspended to probation. Father subsequently filed an appeal to challenge his sentence, which remains pending. Currently, Father's earliest possible release date is December 29, 2041.

[16] On March 14, 2017, DCS filed a petition to involuntarily terminate the parental rights of Father and Mother. On May 31, 2017, the trial court conducted a hearing on DCS's termination petition. At the time of the termination hearing, Mother remained incarcerated and did not plan on posting bond. She had not seen or spoken with the Child since her arrest in June of 2016. Her criminal jury trial was scheduled for September 19, 2017.[3] On August 24, 2017, the trial court issued its Order, terminating Father's and Mother's parental rights to the Child. The trial court concluded, in pertinent part, that there is a reasonable probability that the conditions resulting in the Child's removal and continued placement outside the parents' home will not be remedied; there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being; it is in the Child's best interests that the parent-child

---

[3] A review of Mother's criminal docket in Odyssey establishes that, on September 21, 2017, a jury found her guilty of neglect of a dependent resulting in death, a Level 1 felony; neglect of a dependent resulting in serious bodily injury, a Level 3 felony; neglect of a dependent resulting in bodily injury, a Level 5 felony; neglect of a dependent, a Level 6 felony; false informing, a Class A misdemeanor; failure to report a dead body, a Class A misdemeanor; and obstruction of justice, a Level 6 felony. In addition, Mother pled guilty to both Counts of perjury, Level 6 felonies. On November 8, 2017, Mother was sentenced to an aggregate term of forty-four years, with forty years executed in the Indiana Department of Correction and four years suspended to probation. On December 6, 2017, Mother filed an appeal to challenge her conviction, which remains pending.

relationship be terminated; and DCS has established a satisfactory plan for the Child's care and treatment going forward.

Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Mother challenges the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). In fact, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Nevertheless, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* When "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child relationship is "an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

Indiana courts have a firmly established "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique

position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Thus, on appeal, we nether reweigh evidence nor assess the credibility of witnesses. *Bester*, 839 N.E.2d at 147. We will "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* Furthermore, because the trial court entered special findings of fact and conclusions thereon, we rely on the standard set forth in Indiana Trial Rule 52(A): we "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." In applying this two-tiered standard, we must first determine whether the evidence supports the trial court's findings; second, we consider whether the findings support the judgment. *Id.* We will find a judgment to be clearly erroneous "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Id.*

## II. *Termination of Parental Rights Statute*

[20] In order to terminate a parent's rights to his or her child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *
> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;
>
> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.*

[21] In this case, Mother concedes that the Child has been removed from the home for the requisite period of time pursuant to Indiana Code section 31-35-2-4(b)(2)(A). However, she argues that DCS failed to establish the remaining three elements: (1) that there is a reasonable probability either that the conditions resulting in the Child's removal or continued placement out of the home will not be remedied or that the continuation of the parent-child

relationship poses a threat to the Child's well-being[4]; (2) that termination is in the Child's best interests; and (3) that there is a satisfactory plan for the Child's care and treatment. We will address each element in turn.

A. *Threat to the Child's Well-Being*

[22] Indiana Code section 31-35-2-4(b)(2)(B) requires DCS to prove only one of three listed elements. *See In re A.K.*, 924 N.E.2d at 220-21. The two relevant inquiries in this case are whether there is a reasonable probability that the conditions resulting in the Child's removal and continued placement outside of the home will not be remedied or whether there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being. Here, we elect to dispose of this statutory element by reliance on the latter prong.

[23] Mother claims that the trial court erred in determining that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being. In making such a determination, "a trial court should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re A.P.*, 981 N.E.2d 75, 81 (Ind. Ct. App. 2012). The trial court must also judge the "parent's fitness

---

[4] DCS did not allege that the Child had twice previously been adjudicated a CHINS to satisfy Indiana Code section 31-35-2-4(b)(2)(B).

to care for her child as of the time of the termination proceedings, taking into consideration evidence of changed conditions." *Id.*

[24] Mother does not specifically challenge any of the trial court's findings, instead generally contending that the evidence as a whole is insufficient to support the trial court's conclusion. Mother argues that "[t]o the extent she was able and her participation did not result in her self-incrimination, Mother was compliant with her services, attended parenting classes, and passed her drug screens. She also attended her appointments and all of her [c]ourt dates." (Appellant's Br. p. 33). Mother also relies on the positive reports from the visitation supervisor, who observed no safety issues and who noted a loving bond between Mother and the Child. Mother contends that she is not a substance abuser and that she "demonstrated a desire to provide a healthy and drug free environment." (Appellant's Br. p. 33). Interestingly, Mother also claims that she could not be a threat to the Child's well-being by virtue of the fact that "she was incarcerated at the time of the termination hearing, which eliminated any concern regarding Mother's neglect toward the Child." (Appellant's Br. p. 33).

[25] Clear and convincing evidence need not show that "'the continued custody of the parents is wholly inadequate for the child's very survival.' Rather, it is sufficient to show by clear and convincing evidence that 'the child's emotional and physical development are threatened' by the respondent parent's custody." *Bester*, 839 N.E.2d at 148 (internal citation omitted) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1233 (Ind. 1992)). In assessing a "child's physical, emotional and mental well-being, the trial court may consider

a myriad of factors." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1235 (Ind. 2013). In this case, the trial court determined that continuation of the parent-child relationship poses a threat to the Child's well-being because

> [t]he [C]hild needs stability in life. The [C]hild needs parents with whom the [C]hild can form a permanent and lasting bond to provide for the [C]hild's emotional and psychological as well as physical well-being. The [C]hild's well-being would be threatened by keeping the [C]hild in [a] parent-child relationship with either parent whose own choices and actions have resulted in substantiated neglect and criminal charges related to neglect causing the death of the [C]hild's younger sibling.

(Appellant's App. Vol. II, p. 29).

[26] We cannot find error in the trial court's decision. We do acknowledge that Mother's incarceration in a county jail limited her opportunity to engage in reunification services and that she had, prior to her arrest, participated in visitation with the Child and was working on other aspects of her case plan. Nevertheless, it cannot be ignored that, notwithstanding that Mother had not yet been convicted by the time of the termination hearing, she was awaiting trial on very serious charges connected to B.G.'s death. Father had already pled guilty to the same charges, establishing that there was a serious level of neglect present in their shared home.

[27] During the termination hearing, the evidence was limited as Father and Mother invoked their rights against self-incrimination. Nevertheless, the pathologist's autopsy findings provided insight into the type of treatment that both B.G. and

the Child were exposed to in the parents' home. At the time of death, B.G. was malnourished and dehydrated, which made her more susceptible to other medical conditions. The autopsy report alleged the possibility of "poor feeding or . . . poor care" as the cause of B.G.'s "growth retardation." (DCS Exh. 3, p. 35). However, even if her physical condition was "not necessarily indicative of abuse," both Father and Mother utterly failed to even attain the *minimal* benchmark for parental fitness by acting as "reasonably prudent caregiver[s]" who should have obtained medical help for their child's dire condition. (DCS Exh. 3, p. 36). Just as concerning is the parents' conduct in the wake of discovering that B.G. had died. Father and Mother never contacted emergency services upon discovering that B.G. was unresponsive; instead, they personally determined that she was dead and then waited more than a day to take further action. At one point, they even left B.G.'s lifeless body in their vehicle while they visited with Father's sister. Although the Child, unlike B.G., survived infancy, she was noticeably underweight at the time of removal.

[28] We are unpersuaded by Mother's insistence that the Child was not at risk of neglect based on the fact that there were no safety concerns observed during the fully supervised visits that occurred before her arrest, and that she consistently provided food and diapers for the visits. Throughout the case and even during the termination hearing, both parents continued to deny that they had neglected the needs of either of their children. In fact, the social worker who completed Mother's initial intake assessment at Wabash Valley Alliance indicated that Mother "appeared to portray herself in a positive light and as the victim"—

particularly blaming "DCS and law enforcement perceptions." (DCS Exh. 5, p. 6). Mother "significantly focus[ed] more on her emotions as a parent and victimization than the trauma her children have endured. [Mother] also appeared to have a sense of entitlement as evidenced by her extensive history of unemployment and refusal to obtain employment and reliance on government resources despite her ability to work." (DCS Exh. 5, p. 6). Furthermore, Mother "exhibits Narcissistic Personality traits as evidenced by her verbalizing a grandiose sense of self-importance, preoccupation with perceived optimal parenting, sought excessive admiration and demonstrates a sense of entitlement." (DCS Exh. 5, p. 7). Throughout the case, both parents provided inconsistent information to service providers and were explicitly dishonest— such as Mother's denial of ever having used marijuana despite its presence in the meconium of both the Child and B.G.

[29]    In addition to the physical threat posed, there is ample evidence that the Child's mental and emotional well-being would be threatened by the continuation of the parent-child relationship. DCS, the Child's court-appointed special advocate (CASA), and the Child's therapist all testified in favor of terminating Mother's parental rights in order to allow the Child to achieve permanency and stability. Our courts have previously held that "termination should not result 'solely because there is a better home available for the children." *K.E.*, 39 N.E.3d at 649. Here, however, the Child's therapist confirmed that the Child's uncertainty in her placement was causing trauma. In addition to the Child's removal from her parents, the therapist further identified B.G.'s death as a

source of trauma. Certain behaviors displayed by the Child—such as her caretaking role when there was a younger foster brother in the home—demonstrated that "she was aware of [w]hat was happening and what was going on [with B.G.], but not sure what to do about it." (Tr. Vol. II, p. 14). The therapist stated that the Child needed to process these traumatic events and "get[] a sense of control over a situation she had no control over." (Tr. Vol. II, pp. 14-15). The therapist diagnosed the Child with post-traumatic stress disorder and stated her concern that the Child would be at risk for reactive attachment disorder if she were to be removed from her foster home. The Child had established a bond with her foster parents and felt safe; by disrupting that, the therapist opined that the Child would experience trouble with relationship boundaries in the future. Accordingly, we find that DCS presented sufficient evidence to support the trial court's determination that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being.

## B. *Best Interests of the Child*

[30] Mother also claims that the trial court erred in determining that termination of her parental rights was in the Child's best interests. The parent-child relationship is undoubtedly "one of the most valued relationships in our culture." *Bester*, 839 N.E.2d at 147 (quoting *Neal v. DeKalb Cnty. Div of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Thus, the purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. When

considering whether termination would be in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. It is well established that "[p]ermanency is a central consideration in determining the [child's] best interests." *Id.* (alterations in original) (quoting *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009)).

[31] As with the prior issue, Mother again relies on her participation in some services prior to her arrest, her positive visits with the Child, and her "willingness" "to turn her life around for the sake of herself and the Child" as evidence that termination was not warranted. (Appellant's Br. p. 27). On the other hand, DCS, the Child's CASA, and the Child's therapist all advocated for termination as being in the Child's best interests. *See McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003) (discussing that the testimony of the DCS caseworker and the guardian ad litem "alone is sufficient to support the court's conclusion that termination is in the children's best interests"). Here, in addition to the therapist's testimony regarding the Child's need for stability, the Child's CASA reported that the Child was thriving in her foster care placement, and DCS added that "it would be a traumatic experience for [the Child] . . . to be removed from who she believes

and who she knows to be her parents at this stage in her young life." (Tr. Vol. II, p. 65). It was incumbent upon the trial court to weigh the evidence and make credibility determinations, and it was well within the trial court's discretion to rely on the opinions of the professionals who have been working with the Child throughout the case.

[32] Moreover, it is well established that "[a] parent's historical inability to provide a suitable environment along with the parent's *current* inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *In re A.P.*, 981 N.E.2d at 82 (emphasis added). Although Mother was still awaiting trial at the time of the termination hearing, she acknowledges in her appellate brief that she has since been convicted. Absent a successful criminal appeal, Mother is not expected to be released from prison until well after the Child reaches the age of majority and is currently in no position to care for the Child. Yet, Mother has pursued this appeal, willing to upset the Child's stability on the gamble that her criminal appeal will succeed. We respect Mother's exercise of her right to appeal, but the social worker's assessment of Mother as someone who focuses on her own emotions and perceived victimization rather than "the trauma her children have endured" resonates. (DCS Exh. 5, p. 6). We conclude that the totality of the evidence supports the trial court's determination that termination of Mother's parental rights is in the Child's best interests.

## C.  *Satisfactory Plan for Child's Care*

[33]    Although she lumps it in with her other arguments and does not raise it as an independent issue, Mother has challenged the Child's foster care placement, which essentially amounts to a claim that DCS failed to establish a satisfactory plan for the care and treatment of the Child pursuant to Indiana Code section 31-35-2-4(b)(2)(D).  In particular, Mother contends that she had requested that her mother "be considered for purposes of permanent placement, such as guardianship or adoption," but "DCS failed to provide any evidence that the Child's maternal grandmother had been considered accordingly."  (Appellant's Br. p. 34).  As there was "no evidence that the Child's maternal grandmother's home was unsuitable or that maternal grandmother had anything to do with B.G.'s death," Mother insists that the maternal grandmother "should have been considered for guardianship or adoption, [and] the trial court's termination should be vacated and set aside."  (Appellant's Br. p. 34).  At the outset, we note that Mother has waived her argument by failing to cite any authority in support of her position.  *See* Ind. Appellate Rule 46(A)(8)(a).  We elect to address this issue notwithstanding her waiver.

[34]    "For a plan to be 'satisfactory,' for purposes of the statute, it 'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'"  *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 374 (Ind. Ct. App. 2007), *trans. denied*.  In this case, the trial court found, and the evidence supports, that DCS's plan for the Child is to be adopted by her current foster parents.  This is

a satisfactory plan for purposes of the termination statute. *See id.* As to Mother's belief that the maternal grandmother should have been given priority placement status, it appears that the maternal grandmother submitted forms for a DCS background check on October 24, 2016, and DCS observed no safety concerns when a home visit was conducted on December 9, 2016 (as the maternal grandmother did not want to schedule the home visit during DCS's available time in November). No additional evidence was provided as to any further consideration of the maternal grandmother from that point; nor is there any indication in the record that Mother or the maternal grandmother pursued this placement option. Nonetheless, by the time of the maternal grandmother's home inspection, the Child had been placed with the foster parents for more than a year and was involved in therapy to address concerns stemming from a lack of stability. Understandably, DCS would be reluctant to withdraw the Child from a foster home where she felt safe and had established a bond. We find no error in the trial court's determination that DCS established a satisfactory plan for the Child's care.

# CONCLUSION

[35] Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's termination of Mother's parental rights to the Child.

[36] Affirmed.

[37] Baker, J. and Brown, J. concur